**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**NORTHERN DIVISION**

JENNIFER GOTHARD,

                             CASE NO. 1:17-cv-13638

         *Plaintiff*,           DISTRICT JUDGE THOMAS L. LUDINGTON
*v.*                           MAGISTRATE JUDGE PATRICIA T. MORRIS

COMMISSIONER OF SOCIAL SECURITY,

         *Defendant*.

_____/

**MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION ON CROSS**
**MOTIONS FOR SUMMARY JUDGMENT (Docs. 18, 21)**

I.       **RECOMMENDATION**

In light of the entire record in this case, I suggest that substantial evidence supports Defendant Commissioner of Social Security's (Commissioner) determination that Plaintiff Jennifer Gothard is not disabled. Accordingly, **IT IS RECOMMENDED** that Plaintiff's Motion for Summary Judgment, (Doc. 18), be **DENIED**, Defendant's Motion, (Doc. 21), be **GRANTED**, and the decision of the Commissioner be **AFFIRMED**.

II.      **REPORT**

      A.      **Introduction and Procedural History**

Pursuant to 28 U.S.C. § 636(b)(1)(B), E.D. Mich. LR 72.1(b)(3), and by Notice of Reference, this case was referred to the undersigned Magistrate Judge to review the final decision of the Commissioner denying Plaintiff's claim for Disability Insurance Benefits (DIB). The case is presently before the Court upon the parties' cross-motions for

1

summary judgment. (Doc. 18, 21.)

On March 4, 2015, Plaintiff applied for DIB, alleging a disability onset date of November 1, 2013, with her last date of insurance being March 31, 2015. (Tr. 55, 57.) The Commissioner denied her claim. (Tr. 55.) Plaintiff then requested a hearing before an Administrative Law Judge (ALJ), which occurred on September 13, 2016, before ALJ Mary S. Connolly. (Tr. 33-54, 83-84.)  The ALJ issued a decision on December 30, 2016, finding Plaintiff not disabled during the relevant period. (Tr. 18-28.) On September 25, 2017, the Appeals Council denied review, (Tr. 1-3), and Plaintiff filed for judicial review of that final decision on November 8, 2017. (Doc. 1). Plaintiff filed the instant Motion for Summary Judgment on February 28, 2018, (Doc. 18), and Defendant countered with its own Motion on April 19, 2018, (Doc. 21).

### B.    Standard of Review

The district court has jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. § 405(g). The district court's review is restricted solely to determining whether the "Commissioner has failed to apply the correct legal standard or has made findings of fact unsupported by substantial evidence in the record." *Sullivan v. Comm'r of Soc. Sec.*, 595 F App'x. 502, 506 (6th Cir. 2014) (internal quotation marks omitted). Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (internal quotation marks omitted).

The Court must examine the administrative record as a whole, and may consider any evidence in the record, regardless of whether it has been cited by the ALJ. *See Walker v. Sec'y of Health & Human Servs.*, 884 F.2d 241, 245 (6th Cir. 1989). The Court will not "try the case de novo, nor resolve conflicts in the evidence, nor decide questions of credibility." *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994). If the Commissioner's decision is supported by substantial evidence, "it must be affirmed even if the reviewing court would decide the matter differently and even if substantial evidence also supports the opposite conclusion." *Id*. at 286 (internal citations omitted).

### C.    Framework for Disability Determinations

Disability benefits are available only to those with a "disability." *Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007). "Disability" means the inability

> to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than [twelve] months.

42 U.S.C. § 1382c(a)(3)(A). The Commissioner's regulations provide that disability is to be determined through the application of a five-step sequential analysis:

> (i) At the first step, we consider your work activity, if any. If you are doing substantial gainful activity, we will find that you are not disabled.

> (ii) At the second step, we consider the medical severity of your impairment(s). If you do not have a severe medically determinable physical or mental impairment that meets the duration requirement . . . or a combination of impairments that is severe and meets the duration requirement, we will find that

you are not disabled.

(iii) At the third step, we also consider the medical severity of your impairment(s). If you have an impairment(s) that meets or equals one of our listings in appendix 1 of this subpart and meets the duration requirement, we will find that you are disabled.

(iv) At the fourth step, we consider our assessment of your residual functional capacity and your past relevant work. If you can still do your past relevant work, we will find that you are not disabled.

(v) At the fifth and last step, we consider our assessment of your residual functional capacity and your age, education, and work experience to see if you can make an adjustment to other work. If you can make an adjustment to other work, we will find that you are not disabled. If you cannot make an adjustment to other work, we will find that you are disabled.

20 C.F.R. § 404.1520; *see also Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001). "Through step four, the claimant bears the burden of proving the existence and severity of limitations caused by [his or] her impairments and the fact that [he or] she is precluded from performing [his or] her past relevant work." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 474 (6th Cir. 2003). The burden transfers to the Commissioner if the analysis reaches the fifth step without a finding that the claimant is not disabled. *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 643 (6th Cir. 2006). At the fifth step, the Commissioner is required to show that "other jobs in significant numbers exist in the national economy that [the claimant] could perform given [his or] her RFC [residual functional capacity] and considering relevant vocational factors." *Rogers*, 486 F.3d at 241 (citing 20 C.F.R. §§ 416.920(a)(4)(v), (g)).

4

### D.    ALJ Findings

Following the five-step sequential analysis, the ALJ found Plaintiff not disabled under the Act. (Tr. 19-31.) At step one, the ALJ found that Plaintiff's last date of insured status was March 31, 2015, and that she had not engaged in substantial gainful activity since her alleged onset date of November 1, 2013. (Tr. 20.) At step two, the ALJ concluded that Plaintiff had one severe impairment, bipolar disorder, but no severe physical impairments. (Tr. 20-21.) The ALJ also decided, however, that this impairment did not meet or medically equal a listed impairment at step three. (Tr. 21-22.) Next, the ALJ found that Plaintiff had the residual functional capacity (RFC) to perform a full range of work at all exertional levels with the following non-exertional limitations:

> she was limited to 2- to 3-step work activities; she could not work with the public; she could have only occasional brief superficial interactions with co-workers and supervisors; and she would be off task up to 10 percent of an 8-hour workday.

(Tr. 22.) At step four, the ALJ found Plaintiff unable to perform any past relevant work. (Tr. 26.) Finally, at step five, the ALJ determined that jobs exist in significant numbers in the national economy that the claimant can perform. (Tr. 27-28.)

### E.    Administrative Record

#### 1.    Medical Evidence

The first medical examination in the record is from November 2014, contained in a report from Dr. Jeetender Matharu, whom plaintiff visited to "establish care." (Tr. 248.) At the time, the report notes, Plaintiff lived with and provided care for her boyfriend's mother, the boyfriend having recently passed away. The report lists her prescriptions and

past medical history, which consisted of bipolar disorder, hypertension, and hypercholesterolemia. (*Id.*) She also noted a history of anxiety, depression, and difficulties sleeping. (Tr. 249.) The medical examination did not flag any abnormalities—significantly, for present purposes, she had normal muscle strength and no back pain or restricted movement. (Tr. 249-251.) Nonetheless, the report's "Assessment & Plan" section noted "low back pain," without any explanation or description of plans to treat the pain. (Tr. 251.) Plaintiff was prescribed a medication for depression and, at the very end of the report, Dr. Matharu wrote that Plaintiff "needs to see a psychiatrist and a pain management doctor." (*Id.*)

The record then contains various materials from Dr. David Harris, who provided Plaintiff therapy. (Tr. 256-318, 350-418.) At the first appointment, on November 19, 2014, Plaintiff checked a box indicating that there was not a concern she currently was experiencing "any physical conditions." (Tr. 311.) Plaintiff reported that she had previously been on pain medications. (Tr. 312.) The present problems she sought treatment for included anger outbursts, mood swings, depression, and a history of bipolar disease; she was not currently suicidal. (Tr. 312-313.) During one episode, she related, she became enraged after her deceased partner's daughter sold a guitar that had been owned by the partner; Plaintiff threatened her with a BB gun and, when the police were called, Plaintiff slapped an officer, leading to her arrest. (Tr. 285.) The status examination revealed a depressed mood, rapid speech, decreased sleep, and impaired judgment, but Plaintiff was also cooperative and all other measures—such as affect and thought

process—were normal. (Tr. 315-316.) She was diagnosed with a mood disorder.[1]

The following month she attended counseling twice, both times presenting as depressed. (Tr. 304, 307.) But the examinations during each session returned normal results. (Tr. 304-305, 306-307.) During the latter session she reported caring for a grandmother and enjoying crocheting, yardwork, and gardening. (Tr. 301.) Her goal was to return to work and regain her focus. (*Id.*) In the next few sessions, her status examinations remained normal, except for her alternatively anxious, dysphoric, or depressed mood. (Tr. 285-298.) She reported during two sessions that her medication was helping, (Tr. 283, 294), and at another that it was not, (Tr. 281), but she denied the medication had any side-effects, (Tr. 281, 283, 294). She was diagnosed in February 2015 with bipolar disorder. (Tr. 288.)

Her treatment records with Dr. Harris run through July 2016.[2] Throughout, she

---

[1] She was also assessed a Global Assessment of Functioning (GAF) score of 45. (Tr. 317.) That score represents "serious symptoms" or serious impairments in social, occupational, or school functioning. Am. Psychiatric Ass'n, *Diagnostic and Statistical Manual of Mental Disorders* 34 (4th ed., 2000). Plaintiff's score remained roughly the same for many sessions, (Tr. 278, 281, 283, 291, 294, 299, 305, 307, 415, 418), but edged up to 50 in April 2015. (Tr. 270; *see also* Tr. 257, 265, 267, 351). And in August 2015, her score improved further, to 55, (Tr. 412), which no longer indicated "severe" symptoms but only "moderate symptoms" or moderate difficulty in social, occupational, or school functioning.  Am. Psychiatric Ass'n, *supra* at 34. The score subsequently fluctuated between the two levels—*i.e.*, moderate and severe—during the rest of her treatment. (Tr. 356, 361, 364, 367, 372, 377, 381, 387, 395, 398, 403, 405.)

[2] Often, however, the sessions were attended only by Kathleen Yaroch, "MA, LLPC, therapist," (Tr. 258, 265, 267, 271, 279, 281, 284, 352, 365, 368, 379, 383, 399, 401, 405, 408, 416, 419), or Dr. Jeffrey Sendi, (Tr. 388, 396), not Dr. Harris. Neither party argues that Ms. Yaroch's authorship of many of the records is legally significant—that is, the parties do not discuss whether she, as a professional counselor, is an acceptable medical source under either the old or the new regulations. *See* 20 C.F.R. § 404.1502(a) (defining

reported sadness, loneliness, anxiety, and mood swings. *See, e.g.*, (Tr. 317, 361, 367.) But aside from noting that her mood was anxious, depressed, or dysphoric, her status examinations consistently produced normal results, (Tr. 256, 260-61, 264-65, 266-67, 269-70, 273-74, 277-78, 280-81, 282-83, 350-51, 363-64, 366-67, 370-71, 376-77, 380-81, 385-86, 397-98, 406-07, 410-11, 414-15, 417-18),[3] and, in many, her mood was noted to be normal, (Tr. 354-55, 359, 389-90, 393-94, 400-01, 402-03, 404-05). Her medications were often—almost always—noted to be helpful, (Tr. 257, 270, 351, 358, 368, 378, 382, 384, 390, 398, 401, 403, 407, 415, 418), with only a few exceptions, (Tr. 278, 294). Similarly, the medications only rarely had side-effects. (*Compare* Tr. 259 (reporting side-effects), *with* Tr. 257, 265, 267, 270, 281, 283, 351, 368, 378, 382, 390, 398, 401, 403, 407, 415, 418 (reporting no side-effects).)[4] Many session reports mention that Plaintiff served as a caretaker for an elderly woman. (Tr. 259, 270, 272, 278, 284.) On other occasions, she discussed her ongoing attempts to find employment, (Tr. 257, 265, 267, 270, 358, 367, 374, 377-78, 390, 407, 415), even noting her willingness to

---

"acceptable medical source" under the current regulations); 20 C.F.R. § 404.1513(a) (defining the same under the regulations effective when Plaintiff filed her claim); *see also Bates v. Comm'r of Soc. Sec.*, No. 10-12698, 2011 WL 1565532, at *2-3 (E.D. Mich. 2011) (holding that a licensed professional counselor was not an acceptable medical source). Because the parties have not raised the issue and the case does not turn upon it, the Court does not need to decide Ms. Yaroch's status.

[3] During one session, her concentration was noted to be "adequate" rather than "within normal limits." (Tr. 371.) And decreased sleep was reported at other sessions. (Tr. 370-371.)

[4] Another report of side-effects came after she used an old supply of a medication, but on the same page the notes also state that no side-effects had occurred. (Tr. 272.)

move out of state for a job, (Tr. 270), and unsuccessful applications, (Tr. 418). She also stated that she occasionally worked with her sister in a cleaning business. (Tr. 354, 374, 405.)

Dr. Harris completed a two-page, check-box questionnaire regarding Plaintiff in September 2016. (Tr. 426-27.) His answers—"x" marks rather than explanation—were as follows: Plaintiff's depression, anxiety, and panics attacks constituted a severe medical impairment. (Tr. 426.) She had mild to no limitations in her ability to accept instructions or criticism from supervisions, but she had marked limitations in responding to peers, completing work at a consistent pace, maintaining concentration for longer than brief periods, and handling normal work stress. (Tr. 426-427.) Plaintiff would have moderate difficulty responding to workplace changes and behaving predictably, reliably, and in an emotionally stable manner. (Tr. 427.) Finally, Plaintiff would have three or more unscheduled absences from work each month and would be unable to sustain a 40-hour-a-week sedentary job. (*Id.*)

An expert evaluator, Dr. Ashok Kaul, reviewed the record in September 16, 2015 (and thus the record did not include some of the other materials mentioned in this section). (Tr. 60-61.) Dr. Kaul concluded that Plaintiff's "presentation is not consistent with the diagnosis of a bipolar disorder or any psychotic condition," and thus the mental impairment was "non-severe." (Tr. 61.)

In May 2015, Plaintiff saw Dr. Esa Ali concerning a urinary tract infection (UTI). (Tr. 322.) The records indicate that she experienced flank pain associated with the UTI, but that she denied experiencing any other pain, including back or limb pain. (*Id.*) She

was assessed with UTI and low back pain (presumably due to the flank pain, although the notes fail to indicate the reason for this assessment). (Tr. 322-23.) In July, she returned to Dr. Ali, this time complaining of the UTI, low back pain, bipolar disorder, and kidney stones (nephrolithiasis). (Tr. 324.) Despite noting the bipolar disorder, the "mental health history" section was marked "negative." (*Id.*) Two months later, she reported kidney pain and right leg pain, but no back pain; her assessment was now UTI now nephrolithiasis with no mention of back pain. (Tr. 342.) In February 2016, Plaintiff visited Dr. Ali again, the notes showing she had no back pain or other symptoms. (Tr. 332.) The examination revealed no abnormalities. (Tr. 333.) Of note, she had normal gait and muscle strength, "painless range of motion of all major muscle groups and joins," no misalignment or tenderness in her joints or spine, and no abnormal spinal curvatures; she was alert, with appropriate affect and demeanor, her memory was intact, and she had "good insight and judgment." (*Id.*)[5]

The medical record also contains a report from Plaintiff's pharmacy detailing her prescription pickups from June 2012 until September 2016. (Tr. 421-25.) Plaintiff received various narcotics during this period, including painkillers. (*Id.*)[6]

---

[5] An unsigned "health summary" from September 2016 appears among Dr. Ali's records. (Tr. 330-331.) It notes plaintiff's low back pain, bipolar disorder, IBS, nephrolithiasis, and UTI, and also that she was "negative" for mental health history. (Tr. 330.) During her treatment with Dr. Ali, Plaintiff also had a colonoscopy performed by Dr. Robert Ferguson. (Tr. 346-49.) The procedure records indicate she had been experiencing epigastric pain and rectal bleeding. (Tr. 345-46.) She was diagnosed with, among other things, colonic polyp, hemorrhoids, duodenal erosions and ulcers, and esophagitis. (*Id.*)

[6] In September 2016, before her hearing, Plaintiff submitted a form detailing recent medical treatment by Dr. Harris, Dr. Ali, and Dr. Ferguson. (Tr. 238.) According to

Plaintiff was referred to Dr. Lasmi Manyam for a consultative evaluation. (Tr. 52.) Plaintiff told the evaluator that she had experienced lower back pain for 15 to 20 years. On a visual analog scale of 1 to 10, the pain registered at 4 when it was severe; but there was no corresponding weakness in her legs. (Tr. 429.) In the mornings, her back was stiff, but it limbered up once she moved around. (*Id.*) She could stand for 15 to 30 minutes, walk for the same amount, and carry 10 to 20 pounds. (*Id.*) The examination notes show that Plaintiff walked and sat without difficulty, was cooperative and had only slight limitation on her range of motion with "some" non-radiating pain. (Tr. 430.) Dr. Manyam's impression was, in relevant part, "[l]ower back pain probably secondary to degenerative arthritis. No significant radiculopathy . . . . No generalized weakness of the lower extremities." (Tr. 431.) Plaintiff should be able to lift and carry up to 20 pounds, and might have "slight limitation of long standing or long walking or sitting." (*Id.*) More specifically, Plaintiff could sit for four hours during an eight-hour workday, and stand and walk for two hours each. (Tr. 433.) While Plaintiff's grip was good, (Tr. 431), she had various limitations on the use of her hands and feet, as well as on postural activities (like crawling) and environmental exposure (such as to extreme cold). (Tr. 434-36.) These restrictions, however, were Dr. Manyam's opinion regarding Plaintiff's current condition only, not her past abilities, and Dr. Manyam was uncertain whether they had lasted, or would last, longer than 12 consecutive months. (Tr. 437.)

---

Plaintiff, the doctors told her, among other things, that she had bipolar disorder, depression, anxiety, diverticulitis, and lifting restrictions. (*Id.*)

### 2.      Application Reports and Administrative Hearing

### i.      Plaintiff's Reports

Plaintiff reported working as a barmaid from 1976 until 1995. (Tr. 194.) Her next jobs were with General Motors from 2005 until 2008, followed by work as a baker and as a cashier in 2012. (*Id.*)

In her function report, Plaintiff claimed the following conditions rendered her disabled: bipolar disorder, depression, anxiety, diverticulitis, degenerative discs, panic attacks, and sciatica. (Tr. 203.) She spent most days sitting. (Tr. 204.) She had no dependents she cared for, but she did have pets she tried to take for walks. (*Id.*). She had no problems with personal care, but used an alarm to remind her to take medications. (Tr. 204-205.) She cooked for herself, although her back pain limited her ability to stand; she also did house- and yard-work, the latter depending on how her back felt. (Tr. 205-206.) She could walk and drive, and she shopped, sometimes for an hour or more; she had no problems handling money (but she did not have a savings account). (Tr. 206.)

Her hobbies included reading and watching television, which she engaged in when she could concentrate. (Tr. 207.) Socially, she had become isolated and had little interest in spending time with others. (*Id.*) Nonetheless, she did not have problems getting along with family, friends, neighbors, or others, (Tr. 208), and got along with authority figures "very well," (Tr. 209.) Her self-described limitations were in lifting (nothing over 5 pounds), bending, reaching, walking (only for the distance of a block before needing a rest), sitting, stair-climbing, seeing, memory, completing tasks, and concentrating (for 10 to 20 minutes). (Tr. 208.) She did her best to follow written instructions, and she could

12

follow spoken instructions "well." (*Id.*) Stress caused anxiety and panic attacks. (Tr. 209.) Her concluding, supplementary remark was that "no one will prescribe med for back. Why I don't know." (Tr. 210.)

### ii.      Plaintiff's Testimony at the Administrative Hearing

At the September 13, 2016, hearing, Plaintiff testified about her past work, which involved, among other things, verifying bills and finding parts in a warehouse. (Tr. 37-39.) She could not now work as a bill verifier because she had become aggressive around co-workers and supervisors and could not concentrate. (Tr. 40.) Her panic attacks caused her to become overwhelmed and confused, possibly, she speculated, due to "confrontation with people." (Tr. 41.)

Her long-term partner had passed away and she still had not processed the grief. (*Id.*) She had stayed with his mother as a companion and made sure "she was comfortable" and fed. (Tr. 42.) Others did the shopping and made financial and medical decisions regarding the mother. (*Id.*) After the mother died, Plaintiff moved into her sister's basement. (Tr. 43.) The sister also financially supported plaintiff, who testified that she wished she could return to work but was unable to sit or stand long enough or "mentally function." (Tr. 43-44.) In particular, she noted her past aggression toward co-workers and her assault of a police officer. (Tr. 44.)

Plaintiff had been on pain medication in the past, including oxycodone, but was not presently. (Tr. 45.) Dr. Densley had prescribed the medication, but he moved to Trenton and she no longer saw him. (*Id.*) Imaging studies of her back demonstrated degenerative disc disease and bone spurs; the records, however, were unobtainable. (Tr.

at 45-46.)[7] She continued to have lower back and leg pain. (Tr. 47.) She napped during

the day. (Tr. 48.) As her bipolar disorder worsened, she had begun to isolate herself,

remaining without friends or romantic partners. (Tr. 48.)

### iii.        The VE's Testimony at the Administrative Hearing

The ALJ began by posing a hypothetical individual

> of the same age, education and work experience of the Claimant; no
> exertional limitations; non-exertionally, would need two- to three-step
> work; no work with the public; occasional, brief, superficial interactions
> with co-workers and supervisors; and she would be off task up to 10
> percent in an eight-hour day.

(Tr. 51.) Could such an individual perform any of Plaintiff's past jobs, the ALJ asked the

VE. (*Id.*) The VE responded that the individual could work as a vehicle parts supplier.

(*Id.*) Asked if there were any other jobs that fit the hypothetical individual's restrictions,

the VE responded affirmatively: a garment sorter (200,000 positions nationwide) and

bench assembler (200,000 positions nationwide). (Tr. 52.)

The ALJ then changed the hypothetical: the individual could now work with the

public and have occasional interactions with co-workers and supervisors, but would be

off task 20 percent, would have 3 absences per month, and would need to take

unscheduled breaks of up to 2 hours. (*Id.*) The VE testified that these conditions would

preclude work at all exertion levels. (*Id.*)

---

[7] At this point in the testimony, the ALJ interjected that Plaintiff's prescription records
were insufficient to present evidence of a physical limitation and that a consultative
examination could be ordered. (Tr. 46-47.)

### F.       Governing Law

The ALJ must "consider all evidence" in the record when making a disability decision. 42 U.S.C. § 423(d)(5)(B). The regulations[8] carve the evidence into various categories, "acceptable medical sources" and "other sources." 20 C.F.R. § 404.1513 (2016). "Acceptable medical sources" include, among others, licensed physicians and licensed or certified psychologists. *Id.* § 404.1513(a) (2016). "Other sources" include medical sources who are not "acceptable" and almost any other individual able to provide relevant evidence. *Id.* § 404.1513(d) (2016). Only "acceptable medical sources" can

---

[8]  Various amendments have been made to the regulations since Plaintiff filed her claim. *See, e.g.*, Revisions to Rules Regarding the Evaluation of Medical Evidence, 82 Fed. Reg. 5844-01 (January 18, 2017) (effective March 27, 2017). Because the changes do not alter the outcome here—and, relatedly, they do not appear to exercise an impermissible retroactive effect on Plaintiff's rights, as the amendments are largely procedural changes in the process for analyzing evidence, *cf. Combs v Comm'r of Soc. Sec.*, 459 F.3d 640, 647 (6th Cir, 2006)—and the parties do not discuss them, it is unnecessary to determine whether they apply. Therefore, like many other courts, I will utilize the regulations in effect when Plaintiff filed her claim and the case was decided by the ALJ, along with the new regulations that explicitly apply to claims during this period. *See, e.g.*, 20 C.F.R. § 404.1527; *see generally* Revisions to Rules Regarding the Evaluation of Medical Evidence, 81 Fed Reg. 62560, 62578 (September 9, 2016); *see also Rodriguez v. Colvin*, 3:15CV1723, 2018 WL 4204436, at *4 n. 6 (D. Conn. 2018) ("[T]he Court reviews the ALJ's decision under the earlier regulations because the plaintiff's application was filed before the new regulations went into effect." (citing *Maloney v. Berryhill*, No. 16-cv-3899, 2018 WL 400772, at *1 (E.D. N.Y. 2018) (same))); *Miller v. Comm'r of Soc. Sec.*, No. 1:17CV0718, 2018 2773372, at *5 n. 3 (N.D. Ohio 2018) ("Plaintiff's claim was filed before March 27, 2017, and the ALJ's decision was rendered before the new regulations took effect. For the sake of consistency, the court continues to cite the language from the former regulations that were in effect at the time of the ALJ's decision."), *rep. & rec. adopted by* 2018 WL 2766020 (N.D. Ohio 2018); *Woodall v. Berryhill*, No. 1:17-cv-01289, 2018 WL 3133442, at *7 n. 3 (N.D. Ohio 2018) (applying the rules effective when the claimant applied for benefits), *rep. & rec. adopted by* 2018 WL 3126552 (N.D. Ohio 2018); *Meeks v. Comm'r of Soc. Sec.*, No. 4:17-cv-45, 2018 WL 1952529, at *4 n. 2 (E.D. Tenn. 2018) (applying the rules effective when the ALJ decided the case).

establish the existence of an impairment. SSR 06-03p, 2006 WL 2329939, at *2 (Aug. 9, 2006). Both "acceptable" and non-acceptable sources provide evidence to the Commissioner, often in the form of opinions "about the nature and severity of an individual's impairment(s), including symptoms, diagnosis and prognosis, what the individual can still do despite the impairment(s), and physical and mental restrictions." *Id.* When "acceptable medical sources" issue such opinions, the regulations deem the statements to be "medical opinions" subject to a multi-factor test that weighs their value. 20 C.F.R. § 404.1527. Excluded from the definition of "medical opinions" are various decisions reserved to the Commissioner, such as whether the claimant meets the statutory definition of disability and how to measure his or her RFC. *Id.* § 404.1527(d).

The ALJ must use a six-factor balancing test to determine the probative value of medical opinions from acceptable sources. 20 C.F.R. § 404.1527(c). The test looks at whether the source examined the claimant, "the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and specialization of the treating source." *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004); *see also* 20 C.F.R. § 404.1527(c). ALJs must also apply those factors to "other source" opinions. *See Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 540-42 (6th Cir. 2007); SSR 06-03p, 2006 WL 2329939, at *2 (Aug. 9, 2006).

Because Plaintiff filed her claim before March 27, 2017, she is entitled to the benefit of the treating-source rule.  Under that rule, certain opinions from her treating physicians can receive controlling weight if they are "well-supported by medically

16

acceptable clinical and laboratory diagnostic techniques" and are "not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. § 404.1527(c)(2); *see also Wilson*, 378 F.3d at 544. The only opinions entitled to dispositive effect deal with the nature and severity of the claimant's impairments. 20 C.F.R. § 404.1527(c)(2). Therefore, the ALJ does not owe a treating opinion deference on matters reserved to the Commissioner. 20 C.F.R. § 404.1527(d). Thus, the ALJ "will not give any special significance to the source of an opinion" regarding whether a person is disabled or unable to work, whether an impairment meets or equals a Listing, the individual's RFC, and the application of vocational factors. 20 C.F.R. § 404.1527(d)(3).

The regulations mandate that the ALJ provide "good reasons" for the weight assigned to the treating source's opinion in the written determination. 20 C.F.R. § 404.1527(c)(2); *see also Dakroub v. Comm'r of Soc. Sec.*, 482 F.3d 873, 875 (6th Cir. 2007). Therefore, a decision denying benefits must give specific reasons, supported by record evidence, for the weight granted to a treating source's opinion. *Rogers*, 486 F.3d at 242. For example, an ALJ may properly reject a treating source opinion if it lacks supporting objective evidence. *Revels v. Sec'y of Health & Human Servs.*, 882 F. Supp. 637, 640-41 (E.D. Mich. 1994), *aff'd*, 51 F.3d 273 (Table), 1995 WL 138930, at *1 (6th Cir. 1995).

An ALJ must also analyze the credibility of the claimant, considering the claimant's statements about pain or other symptoms with the rest of the relevant evidence in the record and factors outlined in Social Security Ruling 96-7p, 1996 WL 374186 (July

2, 1996).[9] Credibility determinations regarding a claimant's subjective complaints rest with the ALJ. *See Siterlet v. Sec'y of Health & Human Servs.*, 823 F.2d 918, 920 (6th Cir. 1987). Generally, an ALJ's credibility assessment can be disturbed only for a "compelling reason." *Sims v. Comm'r of Soc. Sec.*, 406 F. App'x 977, 981 (6th Cir. 2011); *Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 390 (6th Cir. 2004).

The Social Security regulations establish a two-step process for evaluating subjective symptoms, including pain. 20 C.F.R. § 404.1529(a) (2016); SSR 96-7p, 1996 WL 374186, at *2 (July 2, 1996). The ALJ evaluates complaints of disabling pain by confirming that objective medical evidence of the underlying condition exists. The ALJ then determines whether that condition could reasonably be expected to produce the alleged pain or whether other objective evidence verifies the severity of the pain. *See* 20 C.F.R. § 404.1529 (2016); SSR 96-7p, 1996 WL 374186, at *2 (July 2, 1996); *Stanley v. Sec'y of Health & Human Servs.*, 39 F.3d 115, 117 (6th Cir. 1994). The ALJ ascertains the extent of the work-related limitations by determining the intensity, persistence, and limiting effects of the claimant's symptoms. SSR 96-7p, 1996 WL 374186, at *2 (July 2, 1996).

---

[9] Although the Commissioner has rescinded SSR 96-7p and eliminated the term "credibility" from Administration policy, SSR 16-3p, 2016 WL 1119029, at *1 (Mar. 16, 2016), the underlying regulation has remained materially unchanged, *see* 20. C.F.R. § 404.1529(c), and I agree with the courts in this District that have continued to apply SSR 96-7p to cases arising prior to its rescission. *See, e.g.*, *Cooper v. Comm'r of Soc. Sec.*, No. 16-cv-13477, 2017 WL 3923984, at *3 (E.D. Mich. August 21, 2017), *Rep. & Rec. adopted by* 2017 WL 3891971 (E.D. Mich. Sept. 9, 2017); *Tuttle v. Comm'r of Soc. Sec.*, No. 16-11144, 2017 WL 2928021, at *6 n. 3 (E.D. Mich. June 9, 2017), *Rep. & Rec. adopted by* 2017 WL 2905125 (E.D. Mich. July 7, 2017).

While "objective evidence of the pain itself" is not required, *Duncan v. Sec'y of Health & Human Servs.*, 801 F.2d 847, 853 (6th Cir. 1986) (quoting *Green v. Schweiker*, 749 F.2d 1066, 1071 (3d Cir. 1984)) (internal quotation marks omitted), a claimant's description of his or her physical or mental impairments will "not alone establish that [he or she is] disabled." 20 C.F.R. § 404.1529(a) (2016). Nonetheless, the ALJ may not disregard the claimant's subjective complaints about the severity and persistence of the pain simply because they lack substantiating objective evidence. SSR 96-7p, 1996 WL 374186, at *1 (July 2, 1996). Instead, the absence of objective, confirming evidence forces the ALJ to consider the following factors:

(i)    [D]aily activities;
(ii)   The location, duration, frequency, and intensity of . . . pain;
(iii)  Precipitating and aggravating factors;
(iv)   The type, dosage, effectiveness, and side effects of any medication . . . taken to alleviate . . . pain or other symptoms;
(v)    Treatment, other than medication, . . . received for relief of . . . pain;
(vi)   Any measures . . . used to relieve . . . pain.

20 C.F.R. § 404.1529(c)(3) (2016); *see also Felisky v. Bowen*, 35 F.3d 1027, 1039-40 (6th Cir. 1994); SSR 96-7p, 1996 WL 374186, at *3 (July 2, 1996). Furthermore, the claimant's work history and the consistency of his or her subjective statements are also relevant. 20 C.F.R. § 404.1527(c); SSR 96-7p, 1996 WL 374186, at *5 (July 2, 1996).

The claimant must provide evidence establishing the RFC. The statute lays the groundwork for this, stating, "An individual shall not be considered to be under a disability unless he [or she] furnishes such medical and other evidence of the existence thereof as the Secretary may require." 42 U.S.C. § 423(d)(5)(A). The RFC "is the most [the claimant] can still do despite [his or her] limitations," and is measured using "all the

relevant evidence in [the] case record." 20 C.F.R. § 404.1545(a)(2). A hypothetical question to the VE is valid if it includes all credible limitations developed prior to Step Five. *Casey v. Sec. of Health & Human Servs.*, 987 F.2d 1230, 1235 (6th Cir. 1993); *Donald v. Comm'r of Soc. Sec.*, No. 08-14784-BC, 2009 WL 4730453, at *7 (E.D. Mich. Dec. 9, 2009).

### G.    Governing Law

Plaintiff makes three arguments. First, she claims that the ALJ erred by not giving Dr. Harris's opinion controlling weight and by failing to provide good reasons for discounting that opinion. Second, she contends that the ALJ's analysis of her physical impairments in the RFC determination was improper. Third, in supplemental briefing, Plaintiff contends that the Supreme Court's recent decision in *Lucia v. S.E.C.*, 138 S.Ct. 2004 (2018), requires remand. None of the arguments convinces me that the ALJ erred or that the case should be remanded.

#### 1.    Dr. Harris's Opinion

As noted above, for claims filed before March 27, 2017, a treating physician's medical opinion regarding the nature or severity of a claimant's impairment is entitled to controlling weight unless the ALJ provides good reasons for discounting the opinion. 20 C.F.R. § 404.1527(c)(2). The "good reasons" rule lets claimants know why their physician's view is being rejected and it also enables meaningful review of the ALJ's rationale. *Wilson*, 378 F.3d at 544.

Plaintiff first argues that the ALJ's analysis of Dr. Harris's opinion evidence is thin and conclusory. (Doc. 18. at 10-11.) But Plaintiff cites only one paragraph of the

ALJ's analysis—the paragraph directly addressing the opinion—and so she misses the preceding, meatier discussion of the objective evidence of Dr. Harris's treatment notes. (Tr. 25-26.) In it, the ALJ observed Plaintiff's role as a caretaker for her partner's mother, her acknowledgment of certain vocational skills, her somewhat "significant" daily activities, and the positive relationships she enjoyed with family. (Tr. 26.) All of this is amply supported in the record. *See, e.g.,* (Tr. 259, 270, 377); *see also* (*supra* at pp. 7-8.) And it supports the ALJ's decision to find lesser limitations than those Dr. Harris suggested, even though the analysis did not come in the precise paragraph concerning the opinion evidence.

Next, Plaintiff attempts to find an inconsistency between the ALJ's findings and the medical record—she claims (Doc. 18 at 11) that the record contradicts the ALJ's statement that she "generally denied having any side-effects during her medication reviews," (Tr. 26.) As proof of the side-effects, she notes that Dr. Harris had adjusted her medications. This is true, *see, e.g.*, (Tr. 276), but there is no indication in the notes that the changes were made in response to side-effects. And, in fact, in the vast majority of reports regarding side-effects Plaintiff denied experiencing any. *Compare* (Tr. 259 (reporting side-effects)), *with* (Tr. 257, 265, 267, 270, 281, 283, 351, 368, 378, 382, 390, 398, 401, 403, 407, 415, 418 (reporting no side-effects).)

Plaintiff then takes issue with the ALJ's statement that she had improved, with the help of medications, by April 2016. (Doc. 18 at 11.) Plaintiff's attack on this statement misses the mark. For one thing, it was made in the ALJ's recitation of the medical evidence and it accurately described the medical record being examined. (Tr. 25, 358.)

21

More generally, it was not, as Plaintiff implies, the lone piece of evidence supporting the ALJ's analysis of Dr. Harris's opinion. Even so, the ALJ would have been justified had she relied more heavily upon this record, as Plaintiff almost always reported that the medications were helping. *Compare* (Tr. 257, 270, 351, 358, 368, 378, 382, 384, 390, 398, 401, 403, 407, 415, 418 (noting the medications were helping)), *with* (Tr. 278, 294 (noting they were not helping).)

Further attacking the statement regarding the April 2016 improvement, Plaintiff points out that the ALJ's focus is misdirected: "normal examination findings" from 2016 do not "address Plaintiff's condition at the time of onset, or prior to the expiration of her insured status," a period stretching from November 1, 2013, until March 31, 2015. (Doc. 18 at 11.) Here, Plaintiff proves too much by emphasizing that this particular report comes after the date she was last insured. As the ALJ's description of the entire record demonstrates, the overwhelming bulk of the medical reports date from the post-insured status period. Indeed, Dr. Harris's name appears in Plaintiff's records on only two dates before her insured status expired. (Tr. 289, 318.)[10] So the ALJ properly focused on what was in the record.

The lack of records from the relevant period is a problem for Plaintiff because "[e]vidence of disability obtained after the expiration of insured status is generally of

---

[10] Defendant asserts that Dr. Harris saw Plaintiff only once during that period, in February 2015. (Doc. 21 at 11-12.) But Dr. Harris's signature appears also appears on the initial evaluation report from November 2014. (Tr. 318.) In addition, Plaintiff was treated by Ms. Yaroch nine times during the insured-status period. (Tr. 277-79, 280-81, 282-84, 290-92, 293-95, 298-300, 303, 304-05, 306-08.)

...

little probative value." *Strong v. Soc. Sec. Admin.*, 88 F. App'x 841, 845 (6th Cir. 2004). Such evidence is usually irrelevant unless it relates back to the insured period. *Moran v. Comm'r of Soc. Sec.*, 40 F. Supp 3d 896, 920-921 (E.D. Mich. 2014).

Plaintiff does not discuss how the post-insured status evidence relates back to the relevant period. Nor did Dr. Harris. The check-mark form he completed indicates that Plaintiff suffered limitations prior to the last insured date, but it fails to describe how he knows this and, in fact, he declined to fill in the spaces specifically provided for such a description. (Tr. 426.) The lack of analysis, alone, justifies discounting Dr. Harris's opinion. *Cf. Hernandez v. Comm'r of Soc. Sec.*, 644 F. App'x 474-475 (6th Cir. 2016) (noting that the court had "previously declined to give significant weight to rudimentary indications that lack an accompanying explanation," and that "[e]ven if the ALJ erred in failing to give good reasons for not abiding by the treating physician rule, it was harmless error because the [check-box analysis unaccompanied by explanation] here is 'weak evidence at best,'" (quoting *Friend v. Comm'r of Soc. Sec.*, 375 F. App'x 543, 551 (6th Cir. 2010)). Dr. Harris's opinion, too, was rendered a year-and-a-half after the period expired, and the "ALJ was not required to ignore the substantial temporal gap between the opinion and the last insured date." *Moran*, 40 F. Supp. 3d at 921. These are all "good reasons" for declining to give the opinion controlling weight.

Shifting ground slightly, Plaintiff makes a related second-order argument that the ALJ's analysis was too cursory to provide "good reasons" for discounting the opinion (regardless, presumably, of whether such reasons existed). (Doc. 18 at 12-13.) Where, asks Plaintiff, does the ALJ discuss the length of the treatment relationship, the nature of

the treatment relationship, the supportability of the opinion, or Dr. Harris's specialty? *See* 20 C.F.R. § 404.1527(c). Nowhere, she concludes, and consequently she was deprived of a fair recounting of why she was not awarded benefits.

This argument fails to persuade. As an initial matter, the reasons already described—e.g., the post-insured date evidence, the lack of narrative explanation in Dr. Harris's opinion, the ALJ's accurate description of the record (contrary to Plaintiff's claims)—were sufficient to justify the ALJ's treatment of the opinion (giving it "some weight" rather than controlling effect). Further, the ALJ did discuss many of the points that Plaintiff says are lacking. Dr. Harris's treatment history is described in detail, demonstrating the length and nature of the treatment relationship. (Tr. 23-25.) Plaintiff concludes that the relationship was long-term, (Doc. 18 at 13), but this ignores that during the material period of the relationship, prior to the end of her insured status, the relationship had barely begun.

The ALJ also assessed the supportability of Dr. Harris's findings, noting that while some abnormalities were found, "most of [the] objective findings were within normal limits" and Plaintiff was able to work at her sister's cleaning business and apply for numerous other jobs. (Tr. 26.) Indeed, the mental status examinations were routinely normal, including findings of a normal "mood" in many. (Tr. 256, 260-61, 264-65, 266-67, 269-70, 273-74, 277-78, 280-81, 282-83, 350-51, 354-55, 359, 363-64, 366-67, 370-71, 376-77, 380-81, 385-86, 389-90, 397-98, 393-94, 400-01, 402-03, 404-05, 406-07, 410-11, 414-15, 417-18.) "Mood" is important because it measures "the more sustained emotional makeup of the patient's personality," that is, whether he or she is euphoric

24

(elevated well-being), euthymic (normal), or dysphoric (depressed or anxious). David C.

Martin, *The Mental Status Examination*, in *Clinical Methods: The History, Physical, and*

*Laboratory Examinations*, chp. 207, p. 925 (Walker, *et al.*, eds. 1990). Likewise, normal

findings on others measures such as the patient's proper mental orientation, memory, and

communication, have been found significant when upholding an ALJ's assessment that a

medical opinion was not well-supported. *See Hammett v. Comm'r of Soc. Sec.*, No. 16-

12304, 2017 WL 4003438, at *1 (E.D. Mich. 2017); *cf. Kuhl v. Comm'r of Soc. Sec.*, 451

F. App'x 802, 805 (11th Cir. 2011) (upholding a finding that depression was not a severe

impairment where, among other things, the claimant served as a caretaker for her

boyfriend and the mental status examination results were "consistently normal").

Accordingly, the ALJ here properly analyzed supportability by noting the normal mental

status examination findings. (Tr. 26.) Finally, as to Dr. Harris's "specialty," the ALJ

observed that he was a medical doctor. (Tr. 23.) Plaintiff does not disclose what other

"specialty" he had, let alone why it is relevant.[11]

　　For these reasons, I conclude that the ALJ properly analyzed Dr. Harris's opinion

evidence.

---

[11] In her reply brief, Plaintiff also contends her low GAF scores are significant. (Doc. 22 at 4.) But reliance on GAF scores has been called into question, *see Spuhler v Colvin*, No. 2:13-CV-12272, 2014 WL 4855743, at *16 (E.D. Mich., June 17, 2014) (discussing caselaw), *rep. & rec. adopted in relevant part by* 2014 WL 4856153 (E.D. Mich., Sept. 30, 2014); *Richardson v. Comm'r of Soc. Sec.*, 70 F. App'x 537, 539 (6th Cir. 2014) (noting that the GAF scores alone were "insufficient to undermine the ALJ's decision"), and the leading diagnostic treatise now rejects their use, Am. Psychiatric Ass'n, *Diagnostic and Statistical Manual of Mental Disorders* 16 (5th ed. 2013). In any case, even if GAF scores were more probative, the ALJ's analysis of Dr. Harris's opinion is supported by substantial evidence for the reasons discussed above.

### 2.      Plaintiff's Physical Impairments

Plaintiff's second argument is that the ALJ "failed to adequately analyze Plaintiff's physical impairments in determining her residual functional capacity" despite evidence from a post-hearing consultative examination and from records prior to the last insured-status date.[12] (Doc. 18 at 7.) The ALJ declined to find any medically determinable physical impairment related to the back pain for the insured-status period because the evidence from that period failed to establish any lower back conditions and the post-hearing examiner could not state when any back problems developed. (Tr. 21.)

Substantial evidence supports the ALJ's analysis. Most significantly, the evidence of Plaintiff's back issues is slim at best. In the only relevant record during the insured-status period, Plaintiff saw Dr. Matharu simply to "establish care." (Tr. 248.) The physical examination during the visit was normal, with no back pain or restricted movement recorded. (Tr. 249-251.) The report ends with an unexplained note of "low back pain" and a referral to a pain management doctor. (Tr. 251.) But these observations are too cursory and undeveloped for the ALJ to rely on, particularly in light of the

---

[12] Plaintiff does not characterize her argument as directly attacking the ALJ's step-two finding that the low back pain was not a severe impairment; rather she contends that the RFC failed to adequately reflect the physical impairment. And, indeed, "[b]ecause an ALJ must consider non-severe impairments in addition to severe impairments when determining whether a claimant can perform substantial gainful activity, courts have held that, so long as the claim for disability is not terminated at the Step Two stage, any potential error in classifying a claimant's impairments as severe or non-severe is generally not reversible." *Katona v. Comm'r of Soc. Sec.*, No. 14-CV-10417, 2015 WL 871617, at *5 (E.D. Mich. 2015) (citing *Maziarz v. Sec'y of Health & Human Servs.*, 837 F.2d 240, 244 (6th Cir. 1987)). Accordingly, the question before the Court is whether the ALJ sufficiently considered the physical impairment evidence when devising the RFC.

contradictory evidence earlier in the session report and when they are the only evidence from a physician during the insured-status period. And, in her initial evaluation with Dr. Harris, which fell within the insured-status period, Plaintiff noted she was not experiencing any physical conditions. (Tr. 311.)

Plaintiff also tries to cobble together an inference of severe back pain by noting that she "testified that she was diagnosed with degenerative changes in her back prior to the expiration of her insured status, testimony which is corroborated by pharmaceutical records showing she was prescribed narcotic pain medication at that time." (Doc. 18 at 14.) It would be odd to receive years' worth of narcotic prescriptions, Plaintiff observes, "without a significant diagnosis." (*Id.* at 16.) Perhaps, but narcotics are prescribed for various conditions, *see* Mark H. Beers & Robert Berkow, eds., *The Merck Manual of Diagnosis and Therapy* (17th ed. 1999), and no record evidence (aside from Plaintiff's uncorroborated testimony) indicates that the diagnosis was for back pain or any particular malady. The ALJ thus had no basis for determining that Plaintiff had low back pain during the relevant period and that the pain resulted in debilitating limitations.[13] These

---

[13] Plaintiff also states that she should not be punished "for the shortcomings of her former treating physician [who lost pertinent medical records and] who apparently could not even be tracked down by the state agency charged with obtaining medical records on behalf of disability claimants." (Doc. 18 at 15; *see also id.* at 16 ("Plaintiff should not be punished for this physician's shortcomings in fulfilling his duty to document medical treatment and provide records when requested by the state agency and by Plaintiff.").) While Plaintiff elsewhere discusses SSR 83-20, she does not cite any legal support to prop up her assertions that she is being punished for the lost records. Even so, the ALJ took the prescribed steps to rectify any possible deficiency in the evidence by appointing a consultative examiner: the regulations provide that when "medical sources cannot or will not give [the Administration] sufficient medical evidence about your [i.e., the claimant's] impairment for us to determine whether you disabled or blind, we may ask

were the proper reasons the ALJ gave when rejecting the significance of the testimony and prescriptions. (Tr. 21.)[14]

Similarly, the ALJ appropriately discounted the opinion evidence from the consultative examiner, Dr. Manyam. (Tr. 21, 26.) While the examiner found some limitations, and thought they might be related to degenerative arthritis, Dr. Manyam could not determine whether any conditions had lasted longer than a year. (Tr. 437.) Because the examination took place more than a year after the last-insured date, the ALJ correctly determined that the report could provide no evidence that Plaintiff was impaired prior to that date. (Tr. 21.) As such, the consultative examination, like the prescriptions and the testimony, do not establish any physical limitations during the relevant period.[15]

Plaintiff's last argument is that the ALJ erred by ignoring SSR 83-20, (Doc. 18 at 17), which is "binding on all components of the Social Security Administration." 20

---

you to have one or more physical or mental examinations or tests." 20 C.F.R. § 404.1517.

[14] One could also note that not even all the post-insured status date evidence supported Plaintiff's claims of back problems. At her February visit with Dr. Ali, for example, she denied experiencing back pain and had "painless" range of motion during the examination. (Tr. 332-333.)

[15] Plaintiff also states that "the ALJ could have and should have sent interrogatories to the consultative examiner regarding whether Plaintiff's physical impairments could relate back to the expiration of her insured status." (Doc. 18 at 16.) But Plaintiff provides no legal or factual grounds for issuing these interrogatories. Generally, ALJs have discretion to decide whether to recontact a medical source, a decision that should be made based on the adequacy of the evidence in the record. *Hollis v. Comm'r of Soc. Sec.*, No. 13-13054, 2015 WL 357133, at *23-24 (E.D. Mich. 2015) (discussing 20 C.F.R. § 1520b(b)(2)(i)). Moreover, the examination report here explicitly applied only to Plaintiff's current conditions and stated that the durations of those conditions was unknown. It is unclear why Plaintiff thinks that asking for the same information in a different manner would have elicited a more favorable answer.

28

C.F.R. § 402.35. The Ruling is meant to be used "when establishing the onset date of disability." SSR 83-20, 1983 WL 31249, at *1 (Jan. 1, 1983). This determination can sometimes be difficult due to the limited evidence available:

> If reasonable inferences about the progression of the impairment cannot be made on the basis of the evidence in file and additional relevant medical evidence is not available, it may be necessary to explore other sources of documentation. Information may be obtained from family members, friends, and former employers to ascertain why medical evidence is not available for the pertinent period and to furnish additional evidence regarding the course of the individual's condition.

*Id.* at *3. This Ruling, according to Plaintiff, fits the present case, and the ALJ erred by not developing the record and "seeking clarification or guidance regarding whether the disabling impairment existed prior to the expiration of Plaintiff's insured status." (Doc. 18 at 18.)

The problem with Plaintiff's position, as Defendant points out, is that the Ruling "applies only when there has been a finding of disability and it is necessary to determine when the disability began." *Key v. Callahan*, 109 F.3d 270, 274 (6th Cir. 1997). But Plaintiff has not been found disabled under any Title of the Social Security Act or in any previous application. *Cf. Martin v. Comm'r of Soc. Sec.*, No. 12-14773, 2014 WL 1048150, at * (E.D. Mich. 2014) (noting that SSR 83-20 applied when the ALJ found no severe impairments at step two on the present application but the claimant had been previously found disabled in an earlier application). Consequently, the Ruling does not apply to Plaintiff. Nor has she shown what evidence would be produced as a result of following the Ruling, which contemplates obtaining evidence "from family members, friends, and former employers." SSR 83-20, 1983 WL 31249, at *3. Plaintiff has not

discussed the possible evidence obtained by these sources or even who these sources might be. In sum, then, the Ruling does not apply, and Plaintiff has not demonstrated that it would be helpful if it did.

For these reasons, I conclude that Plaintiff has failed to show any error in the ALJ's treatment of her alleged physical impairments.

### 3.   Supplemental Briefing

On September 18, 2018, Plaintiff filed a motion, unopposed by Defendant, to file a supplemental memorandum of law regarding new caselaw decided after briefing in this case was completed. (Doc. 23.) I granted the motion,[16] which cites two new decisions, *Lucia v. S.E.C.*, 138 S.Ct. 2004 (2018) and *Jones Bros., Inc. v. Sec'y of Labor*, 898 F.3d 669 (6th Cir. 2018), that she contends "represent[] a significant change in the controlling law." (Doc. 23 at 1.) The former held that ALJs in the S.E.C. are inferior "officers" of the United States subject to the Appointments Clause, Art. 2, § 2, cl. 2, meaning that they must be appointed by the President, the Courts, or a Head of Department. *Id.* at 2054-55. *Lucia* remanded a case decided by an improperly appointed ALJ to the SEC for another hearing. *Id.* The latter case, *Jones Bros.*, held that ALJs of the Mine Safety and Health Administration were also inferior "officers" under the Appointments Clause, and the case was remanded like *Lucia*. 898 F.3d at 671.

Plaintiff asserts that her claim was handled by an improperly appointed ALJ and that, consequently, she deserves a remand for a new hearing. While she alleges that the

---

[16] And the Commissioner's subsequent motion to file a brief. (Doc. 25.) Both parties' briefs have been considered.

ALJ was improperly appointed, her only evidence of that fact is an Emergency Message from the Social Security Administration, EM-18003 REV 2 (Aug. 6, 2018), *available at* https://secure.ssa.gov/apps10/reference.nsf/links/08062018021025PM, in which the Administration noted *Lucia* and stated that the Acting Commissioner ratified the appointment of all ALJs on July 16, 2018. From this alone—and this is all we have—it is not at all apparent that the ALJ here was improperly appointed. Contrary to Plaintiff's assertion (Doc. 23 at 2), the Message does not acknowledge that Social Security ALJs had been unconstitutionally appointed before the ratification—it neither mentions the prior appointment system nor accepts that *Lucia* applies.

Assuming the ALJ's original appointment would be improper if the Appointments Clause applies, Plaintiff still failed to raise this issue below. The general rule is that a claimant forfeits an argument not raised at some point in the proceedings below. Kubitschek & Dub, *Social Security Disability: Law & Procedure in Federal Court* 892 (2017 ed.) ("Historically, reviewing courts have declined to hear arguments that the parties did not raise below" at the administrative level.); *see, e.g.*, *Motin v Comm'r of Soc. Sec.*, No. 09-13354, 2010 WL 1754821, at * (E.D. Mich. 2010) (finding that an argument made to the Appeals Council but not to the ALJ or in the application for benefits was unpreserved). Plaintiff attempts to skirt this failure by noting that there was an "intervening change in controlling law" that "raises an important constitutional question." (Doc. 23 at 5.) But there was no "change" such as the overturning of precedent or the establishment of a new rule that conflicted with an old one. Indeed, the plaintiff in *Lucia* first raised the Appointment Clause argument without the benefit of the Supreme

31

Court's subsequent decision. *Lucia*, 138 S.Ct. at 2050. And Plaintiff herself notes that *Jones Bros.* turned on the unique statutory framework at issue there.[17] (Doc. 23 at 4.)

Citing *Sims v. Apfel*, 530 U.S. 103 (2000), Plaintiff contends that she was under no obligation to raise issues to the Administration Appeals Council in order to preserve them for judicial review. She is correct that *Sims* held as much, *i.e.*, "a claimant pursuing judicial review has [not] waived any issues that he did not include in [his or her] request" for review by the Appeals Council. *Sims*, 530 U.S. at 105. But many, if not all, post-*Lucia* decisions have rejected the argument that *Sims* or some other rationale absolves the claimant's failure to raise the Appointments Clause at the agency level in the Administration. *See, e.g.*, *Davidson v. Comm'r of Soc. Sec.*, No. 2:16-cv-00102, 2018 WL 4680327, at *2 (M.D. Tenn., 2018) ("Because Plaintiff did not raise her as applied constitutional challenge at the administrative level or argue that she had good cause for her failure to do so, Plaintiff has waived her challenge to the appointment of her Administrative Law Judge."); *Stearns v. Berryhill*, No. C17-2031, 2018 WL 4380984, at *5-6 (N.D. Iowa 2018) (noting, in a Social Security case, that because the claimant failed to raise the issue before the ALJ's decision became final, she forfeited it); *Trejo v. Berryhill*, No. 17-0897, 2018 WL 3602380, at *3 n. 3 (C.D. Cal. 2018) ("To the extent

---

[17] *Jones Bros.* also suggested that courts "generally expect parties like Jones Brothers to raise their as-applied or constitutional-avoidance challenges before the Commission [*i.e.*, agency] and courts hold them responsible for failing to do so." 898 F.3d at 677. By contrast, a facial challenge to a statute—that is, the argument that the statute requires unconstitutional appointments—would not lead to a forfeiture if the party fails to raise the claim below. *Id.* *Jones Bros.* found that the party did forfeit its claim, but the forfeiture was excusable. *Id.* Thus, the case does not stand for the proposition that forfeiture is inapplicable to claims like Plaintiff's.

32

*Lucia* applies to Social Security ALJs, Plaintiff has forfeited the issue by failing to raise it during her administrative proceedings."); *Karl K. v. Comm'r of Soc. Sec.*, No. 17-CV-0304, 2018 WL 4339381, at *2 n. 2 (E.D. Wash. 2018) (same). *Sims* has been found inapposite because it did not "address[] whether the issue had to be raised before the ALJ," as opposed to raised before the Council. *Stearns*, 2018 WL 4380984, at *5. This reasoning is persuasive. Thus, there being no applicable exception to Plaintiff's obligation to raise the argument, Plaintiff's failure to raise her argument below renders it unpreserved.

Even if not forfeited below, Plaintiff's present cursory argument gives no reasons why the Appointments Clause applies to Social Security ALJs, *i.e.*, Plaintiff does not even discuss why the logic of *Lucia* and *Jones Bros.*—neither of which addressed Social Security ALJs—extends to this context. More is needed, as *Lucia* itself closely examined the framework for S.E.C. ALJs before deciding they were inferior officers. *Lucia*, 138 S.Ct. at 2053-54; *see also Jones Bros.*, 898 F.3d at 679 (assessing the relevant statutory powers and duties of ALJs). Plaintiff here offers no such analysis, and the argument has evaded any adversarial sharpening. Assuming, then, that Plaintiff can raise the argument at this late date, she has left the Court without the necessary tools to resolve it. *Cf. United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991) ("A skeletal 'argument,' really nothing more than an assertion, does not preserve a claim. . . . Judges are not like pigs, hunting for truffles buried in briefs."). This is fatal, as the Sixth Circuit has "repeatedly held that a party forfeits any allegations that lack developed argument." *Jones Bros.*, 898 F.3d at 677.

33

For any of these reasons—*i.e.*, the murky factual basis of the claim (the ALJ's original appointment), the forfeiture below, or the lack of a developed argument—I recommend rejecting Plaintiff's request for a remand on this basis.

### H.    Governing Law

For the reasons stated above, the Court **RECOMMENDS** that Plaintiff's Motion for Summary Judgment, (Doc. 18), be **DENIED**, Defendant's Motion, (Doc. 21), be **GRANTED**, and the decision of the Commissioner be **AFFIRMED.**

## III.   REVIEW

Pursuant to Rule 72(b)(2) of the Federal Rules of Civil Procedure, "[w]ithin 14 days after being served with a copy of the recommended disposition, a party may serve and file specific written objections to the proposed findings and recommendations. A party may respond to another party's objections within 14 days after being served with a copy." Fed. R. Civ. P. 72(b)(2); *see also* 28 U.S.C. § 636(b)(1). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Sec'y of Health & Human Servs.*, 932 F.2d 505 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981). The parties are advised that making some objections, but failing to raise others, will not preserve all the objections a party may have to this Report and Recommendation. *Willis v. Sec'y of Health & Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Dakroub v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this magistrate judge.

Any objections must be labeled as "Objection No. 1," "Objection No. 2," etc. Any objection must recite precisely the provision of this Report and Recommendation to which it pertains. Not later than 14 days after service of an objection, the opposing party may file a concise response proportionate to the objections in length and complexity. Fed. R. Civ. P. 72(b)(2); E.D. Mich. LR 72.1(d). The response must specifically address each issue raised in the objections, in the same order, and labeled as "Response to Objection No. 1," "Response to Objection No. 2," etc. If the Court determines that any objections are without merit, it may rule without awaiting the response.

Date:  October 10, 2018                     S/ PATRICIA T. MORRIS
                                            Patricia T. Morris
                                            United States Magistrate Judge


### CERTIFICATION

I hereby certify that the foregoing document was electronically filed this date through the Court's CM/ECF system which delivers a copy to all counsel of record.

Date: October 10, 2018                     By s/Kristen Castaneda
                                            Case Manager